Good morning, ladies and gentlemen. We're here for the oral argument in Abebe v. Mukasey. Good morning, Judge Rule. Good morning. How's the weather in Seattle? It's nice and cloudy, but we like it like that. We wouldn't change it for you. Counsel ready to proceed? May it please the Court, I'm Robert Jobe, and I'm appearing pro bono today on behalf of the petitioner, Mr. Abebe. The central question in this case is whether the current administrative scheme for allocating 212C relief violates the equal protection component of the due process clause of the Fifth Amendment. To illustrate what we consider the irrationality of the current scheme, I want you to imagine that Mr. Abebe has a twin brother, and with that twin brother, he conspired to commit the crime for which he was convicted. They committed the crimes together on the same day against the exact same victim. They were arrested on the same date, went to trial on the same date, were convicted on the same date, sentenced to the exact same term of imprisonment, one year in county jail and three years of supervised probation. And I want you to further assume that Mr. Abebe's twin brother sought 212C relief on the exact same day as Mr. Abebe, the only exception being that Mr. Abebe's twin brother had departed the United States after committing the crime, and when he reentered, he was stopped at the border, filed his application for 212C relief there at the border. Now, what would have happened to the twin brother? We know what happened with Mr. Abebe. He was denied because the under blank, there's no corresponding ground of inadmissibility. But what would have happened to his twin brother who committed the exact same crime? At the border, if he had arrived in 2005, at that point, the Flutie doctrine had been repealed eight years earlier. And what was in effect was the current version of the statute 101A13C5 that says even a lawful permanent resident who departs the United States is considered to be an applicant for admission if he has committed an offense listed in Section 212A2 of the Act, a crime involving moral turpitude. And it's undisputed that at that time, the government was applying that irrespective of when the crime was committed. So anybody, any lawful permanent resident who had departed the United States after April 1st, 1997, and before this Court made its decision in Kamens just last year, would have been stopped at the border and charged with inadmissibility as this man would have been, the twin brother. And if he had been charged with inadmissibility at the border, what would have happened? He – the only charge that they could have brought against him for the crime would have been that he's inadmissible as somebody who had been convicted of a crime involving moral turpitude. His crime unquestionably is. It's not a petty offense. He was sentenced to in excess of six months, so he would have been inadmissible. He would have been able to apply for 212C relief, and the effect would be, and this is what the strangest part about this, is that if he had been granted 212C relief under matter of Balderas and other board law, he would have been admitted to the United States, and then the government would have been barred from filing any sort of deportation charge against him, including an aggravated felony charge of deportation. But they would have been barred from filing any charge of deportation against him that rested on the conviction that had formed the basis of the charge of inadmissibility. Counsel, can I ask you a practical question? Yes. What we're arguing about here is basically entitlement to apply for relief. The Attorney General still has the discretion, which is unreviewable as I understand the current law, to look at this case and say this case involves a child molestation, an 8-year-old victim, and this is an undesirable alien, and I'm not going to grant relief for that reason. That's correct. The only review that the Court would have of the Attorney General's determination on the merits would be if there were a question of law. What's irrational about the situation? I mean, one guy leaves, one guy stays, and the government decides to treat differently the guy who leaves. For one thing, the guy who leaves exposes him to the possibility, exposes himself to the possibility that he won't be let in and he'll be stuck outside. So the government says, well, you know, we'll give you some – we'll teach you a little better because you take a real risk that you might never come back, and we don't have to bother deporting you. We don't have to buy you a plane ticket or anything else. What's irrational about that? Well, the problem with that, Your Honor, is that back in 2004, 2005, the departure under this statute that was being applied at the time, the departure, even if it were for an hour, a day, it didn't matter. As long as the individual departed and returned to the United States, he could avail himself of seeking 212c relief. So what? No court – no court has suggested that there's a rational basis for treating a lawful permanent resident who departs the United States briefly more favorable than a lawful permanent resident who's more secondary. Only two courts have ever considered it, and that was Francis and we followed Tapia Kuna, and there's never been another case since 1970. Francis was 75, Tapia Kuna was 81, and there's never been another court that has looked at the matter, and I don't get it. I don't understand why our government, in dispensing what we understand to be the we are going to treat people who leave, give them a break, and we don't give to other people who don't leave. Why can't it do that? What's your rational? Let me just comment on a couple points to that. I mean, first off, yes, Francis was followed by every circuit. Every circuit agreed it was irrational. No. No. What happened is our circuit followed it, and the BIA then acquiesced, and so the issue never arose again. So it's not like any other circuit after the Ninth has ever looked at the issue again. Francis said what it said, not very persuasively. We followed it, not very persuasively in my view, and that was it. Eighty-one is the last time anyone has ever looked at it. But we are now in bank, and we can overrule Tapia Kuna, and so you have to persuade us that Francis and Tapia Kuna were right. Well, in Francis, the government never even attempted to argue that there was a rational basis for distinguishing between these two groups of people. And in this case, the government's never argued that there's a rational basis. Insofar as you're suggesting that it's rational to treat somebody who departs from the United States even for an hour, preferably, than somebody who remains here in the United States with his family, his church, his community, or I would just – I mean, this is a very difficult thing to make that call, obviously. That's your job, to persuade me that that's, in fact, not rational. We know that historically there is some rationality to it. For example, communicable diseases. It used to be a lot of people never got past Ellis Island because they had a communicable disease. They'd be sent back. But if they came down with a communicable disease in the United States, they wouldn't be deported because they got it here and they were already within the borders. So we know that at least in some cases the distinction is rational. We know Congress has plenary power. And we know we have a very high standard of deference under the guillere guillere to the BIA's interpretation of the statute. Let me give you a couple of examples of why I think it would be completely irrational. I mean, first off, you have two different situations. One is where Flutie applies, you know, where Kamens doesn't apply. And the other is where Kamens applies. If we're dealing with a case that's subject to Flutie, a man who departs and returns to the United States would not be considered to be seeking reentry unless the departure was not brief or not innocent. So under your theory, Your Honor, if somebody were to depart the United States for a non-innocent purpose, he leaves the country for a non-innocent purpose, and then he returns, he's actually treated more favorably than somebody who never  That's crazy. Under the current scheme, under your ---- You say that, but you have to explain why it is crazy. I can think of one non-crazy reason, and that is that the guy who comes back shows up at the border station and says, here I am, will you let me in, as opposed to just disappearing into one of the great cities. I'm sorry. I missed the last part there, Your Honor. As opposed to just disappearing into one of the great cities until somebody happens to come across him. Right. Ultimately, we're concerned with two groups of people, both of whom could apply or both of whom would otherwise be eligible for 212C relief. The one who departs for a non-innocent purpose, he gets to apply, whereas the one who doesn't depart, he remains here and he doesn't do anything non-innocent. He's denied the opportunity. Because the guy who leaves then presents himself to the authorities, and so we don't have to go chase him down and try to find him, as Judge Kleinfeld suggests, somewhere in the bowels of one of the great cities. He shows up and says, here I am. I'm going to take my chances. I'm going to try a lawful way in. So we give him an extra break. That we don't give the guy who's hiding out and not. What's your question? What's your question about that? Particularly when you're dealing with congressional, the broadest power known to our government. And that is a power having to do with dealing with aliens. You give somebody who commits a non-innocent act greater deference. I mean, under the current scheme, it's even more egregious, in my opinion. Under the current ---- Yes, Your Honor. You said there were no case that drew a rational distinction between the departing alien and the one who stayed. Permanent resident. What about Vaux in the Fifth Circuit? Permanent resident. Hmm? Permanent resident, Your Honor. To departing permanent resident. Judge Jones said, here the different limits on Section 212C relief act as a carrot to induce a voluntary departure. Isn't that a rational basis? Not the way it's being implemented in our view. And I would go back. Let me just give you another example of why I think it's ---- and this is something that Vaux ---- none of these courts are addressing the fluity aspect of this or the definition of admission. Under the current scheme, if somebody were to depart the United States, they would not be treated as a lawful permanent resident. They would not be treated as seeking admission if their conviction was predated April 1st, 1997. That's Kamens. Unless they depart the United States. After they depart the United States, they commit illegal activity. So under the scheme that you're, you know, Judge Kaczynski's embracing here, somebody who departs the United States, even for a brief period of time, to commit an unlawful act is better off than somebody who never departed the United States and remained here with his family. Isn't that a judgment for Congress to make? Maybe Congress thinks it's better to get people out of here, even if they commit crimes and come back. Well, the problem with this, Your Honor, is that Congress didn't create this scheme. You know, this scheme that was created not by ---- Congress never intended any of these deportable aliens to be getting relief. But the problem is that, you know, through administrative decisions and judicial decisions, it's been extended, and it was extended to people in deportation proceedings who had left, weren't stopped at the border. So, I mean, to start thinking about congressional intent, I sort of ---- it's hard for me to wrap my brain around it, because this ---- the scheme that we have in existence today is not one that Congress ever envisioned. Well, I'm concerned. This is along those lines. But I'm concerned that the rule that you're proposing, if we were to adopt where Blake v. Carbone eventually ---- where the circuit court went on that, is why wouldn't ---- you know, if we were to accept your equal protection argument, then I think almost every aggravated felon would suddenly be entitled to 212 relief, that you would be ---- we would always be looking behind what it could have been, and that I'm concerned about, from a judicial restraint standpoint, that then we're taking away from DHS how they choose to proceed against people, as opposed to whether they go to aggravated felony or moral turpitude. Well, let me answer that. I mean, because, obviously, the aggravated felon and ---- aggravated felons whose crimes constitute crimes involving moral turpitude, and that's who we're talking about, they're already eligible to apply. All they have to do is depart from the United States and apply at the border. So, I mean, if you ---- if you reject it, there's not going to be anything. Obviously, any immigration lawyer is going to say, well, you should just leave the country and apply. I mean, it's not ---- you're not enlarging the class. All that's happening here is we're determining that the issue is whether or not these people who don't depart are going to be in the same position as somebody who does depart briefly. But aren't we opening the floodgates to legal challenges by aggravated felons, that their crimes are equivalent to crimes of moral turpitude, like we're now seeing in other areas of immigration? It's going to come up, for sure. But, you know, I want to comment on that, because ---- So the floodgate will be open. We just don't know how many cases there will be. Well, obviously, we have a diminishing pool of cases, because the only people who are going to benefit from a rule like this are people who are Saint Seer class members. I'm confused about something here. Yes, Your Honor. There are some people who commit aggravated felonies that are not crimes of moral turpitude. Right. They steal a million dollars. Right. Aggravated felony, and at least in some circumstances, it's not moral turpitude. If you do both, though, if you not only steal a million dollars, but you have sex with a little girl on the way out, then you can get discretionary relief, if I understand the argument right, if you win. That's the way it works in practice. I mean, we didn't create the system. And that's kind of the result of the Kibasek decision. I mean, it's true. Isn't that the result of your argument? No. If you not only fall within the set of aggravated felonies, but you fall within the subset of morally turpitudinous aggravated felonies, then you should get relief from deportation. You should be eligible for relief from deportation. Right. Because you would be eligible for relief from exclusion. That's exactly the way it works in practice, is that somebody whose crime, let's take sexual abuse of a minor. Or, no, let's take the case that you're dealing with in Kibasek. I mean, I think ultimately the result in Kibasek was correct. And what's interesting about the theory that, you know, we're setting forth here is I don't think it would change the result of any of the Ninth Circuit cases that we've looked at. It doesn't change the result of Kibasek. It doesn't change the result of Komarenko. It doesn't change the result of Serbian Espinosa. All of those would have the exact same result. But what you're talking about is already part of the system. It's true. Somebody who's convicted of possessing a sawed-off shotgun, that person, if he departs the United States, he's not inadmissible. He can't seek relief at the border. But somebody who takes a sawed-off shotgun and shoots an occupied vehicle, well, that person, if he departs the United States and he seeks to reenter, he can. I agree. That's a crazy result. But under the decision in Kibasek, this Court has held that Congress doesn't have to line up all these crimes on a spectrum and determine which ones are less serious, more serious, and give equal relief to, you know, the people who commit less serious crimes as it does the more serious. That's true. That's a problem. But that's the way the system works right now. Isn't this exactly the kind of irrationality that Francis said was an equal protection violation? I mean, this is the Francis' statement is exactly made from that cloth, saying, you know, we're going to look at the scheme and we're going to say, well, this makes a lot more sense to us. It's sort of like saying, you know, we're going to line up crimes and decide which is more serious and less serious. Right. Well, I you've in this case I Aren't these legislative things? These are not things we ought to be using the Constitution to second-guess? That's all I'm saying is the issue that Judge Kleinfeld is pointing to, that's an issue that exists today. It's not created by anything we're advocating here. That's how the system works today. That's a result of the Kobasic decision that came about in 1988. Well, maybe we'll overrule that some other time. But right now we're talking about taking the one that is in fact I mean, we can't overdo anything about Kobasic in this case because it's not presented. That's right. So the fact that there's some other irrationality elsewhere in the system that may Correcting next time we meet in bank. Right. It doesn't really speak to the question of whether or not we ought to be using equal protection. I mean, the bluntest instrument in the Constitutional arsenal to second-guess these scalpel-like decisions that Congress makes and implement immigration law. I agree that the issue that's presented by Judge Kleinfeld is not raised in this  It's not something you have to deal with. It's part of the system that exists. My only point is that the theory that we're putting forth, it doesn't create that problem. It's already there. But going back to, you know, Congress didn't create it. Congress didn't create any of this. We're so far removed. If you talk to a congressman or congresswomen and tell them about this, they'll be amazed. And you say, what was your intent? They think you're crazy asking them about what their intent was. Ultimately, the way this thing works in practice, you know, it invites people to disrespect the system, because it is entirely arbitrary. You know, for a client that comes in to see me and I tell them, well, you're not eligible unless, of course, you leave the country and you commit a crime abroad. And then you would say, but, you know, you've taken certain risks. You can leave the country and present yourself, but at that point you take certain risks. And one of the risks is you will be excluded, and maybe you're better off sitting at the airport and waiting to be caught. Now, if you do want to get this benefit, there's a way of doing it. You leave the country, you cross the border, and you present yourself at a station and say, look, here's my situation, and I want this relief. And if your client succeeds, great. If not, then somebody who ought not to be in the country. In the context of this case, that makes no sense. Because somebody who has a sexual abuse of a minor conviction like this, who's a registered sex offender, he's going to get picked up whether he leaves or stays. I mean, what the Immigration Service does, it's called Operation Predator, everybody, every alien who's on that list, they're on the Immigration Service's list. Yeah. So back to the question, is the end result going to be he's out of here anyway? Because once his application gets to the deciding official, they're going to look at the nature of the crime and say, gone. No. Why not? Because there are going to be cases where the equities are going to outweigh the crime. And you've got to keep in mind, I think, Judge Tallman, that every one of the cases that we're talking about here, these crimes are old. Necessarily, they're at least 10 years old. Old before 1996. They at least had to be committed before the conviction had occurred before April 24, 1996. Yeah. This guy's conviction is 1992. So they're going to take that into account, the fact that the guy is rehabilitated, and they're going to look at his equities and see if he's going to suffer harm if he's sent back. And in some cases, that's going to outweigh the nature of the conviction. But also, you know, if I could just go back to your question, Your Honor. I mean, I don't think that this is, you know, Komarenko says that this is going to create some, you know, require the courts to engage in this factual inquiry about the underlying conduct. That's not true at all. I don't see how we could avoid it. Well, you'll avoid it quite simply because when we've determined whether a crime is one involving moral turpitude, we don't look at the underlying conduct. I mean, we use the categorical approach. You look at the definition of the crime, and you look at the record of conviction. And in every one of these cases, the guy is charged with deportability as an aggravated felon. To prove up their charge, the government has to submit the record of conviction. That's going to be before the court. So the judge is going to have to determine, well, does this record of conviction, given the definition of this crime, is this an offense that's an aggravated felony? Then he's going to have to take the very next step, which is based on that same record of conviction and that same identical definition of the crime, is it also a crime involving moral turpitude? And it's certainly – I'm not suggesting that the Court should be making those decisions in the first instance. That seemed to be a concern to the Court in Comarenco. Of course not. Just as the Blake court did. You're telling me that you can't conceive of lawyers then asking, well, maybe it doesn't look like a crime of moral turpitude from the record of conviction, but then look at – I've got the police report here, or my client's going to – or my client doesn't agree with this, or, you know, the actual facts that support this. The law is absolutely clear on that. They don't get to do that, you know. In determining whether a crime is one involving moral turpitude, we use the Taylor categorical approach. We look at the definition of the crime. We look at the record of conviction. You're not looking at the underlying facts. It's a simple inquiry. Well, unless you get to the modified categorical approach, and then you might, depending on what the plea agreement consisted of, what the colloquy is. But you're not looking at the police reports. All you're looking at is that – what's part of the record of conviction. And we have a case not too long ago where counsel stipulated to the admission of the police report as the basis for the plea, so it did become part of that. There may be cases like that, but the way I read Navarro-Lopez, that's going to be a very rare case where you're going to result to the modified categorical approach in determining whether a crime is one involving moral turpitude. If it's missing that element, the turpitudinous element, you don't go to the modified categorical approach. This Court just said that on bond. So I frankly think that that is not truly a concern, you know, about judicial economy. And, you know, as I was saying, I don't think the Court should be answering that question in the first instance. That seemed to be concern to the Court in Comeranco. Of course, just like the Blake Court did, you would send this back under Ventura and tell them, the immigration judge, the Board of Immigration Appeals, to reach a tentative conclusion on that point, and then somebody could appeal. Under your theory of the case, would a person subject to removal be entitled to relief or not be entitled to relief for an aggravated felony generally? But if his aggravated felony was morally turpitudinous, then he would be entitled to the eligibility. Correct. The way it would work, I mean, is that the immigration judge would have to look to the definition of the crime and the record of conviction and determine, is this not only an aggravated felony? We know some aggravated felonies are not morally turpitudinous. Right. Some are. Some morally turpitudinous crimes are aggravated felonies. Some are not. Right. And some morally turpitudinous crimes won't make you inadmissible because they may qualify as a petty offense. What I'm asking about is where the crime categorically, so we don't have to get into the modified categorical approach, falls within the intersection of the sets. It's an aggravated felony, and it's morally turpitudinous. Under your analysis, would that alien be better off because he would be eligible for relief from removal than the alien who committed a non-morally turpitudinous aggravated felony? The issue before the judge would be whether this aggravated felony offense would render this alien inadmissible as one who had been convicted or admitted to a crime involving moral turpitude. That's the test. Because if it is such a crime that it would render him inadmissible, then all he has to do to make himself eligible is he departs the United States and seeks to realize at that point. So that's the test. I'm not sure I understood whether you answered my question. I know that that's the general scheme for deciding if there's an equal protection problem. You look to see how they're treated if they go and come back. That's the same. But what I'm asking about is a very specific case where I'm looking at the outcome of your success, if you win, and I want to know if the morally turpitudinous aggravated felon is eligible, but the non-morally turpitudinous aggravated felon is not. Right. Because the non-morally turpitudinous aggravated felon would not be able to seek relief if he departed the United States and sought reentry. I mean, all we're asking is that the court ---- Why is that any more rational than anything Congress has done? It's not. That particular result is not rational, but that is a smaller group of cases. I mean, right now we're dealing with somebody, for example ---- It's this case, isn't it? Let's deal with this case because you're talking more abstractly. That's this case, isn't it? Isn't this case the intersection of the sets? This case involves somebody who's been convicted of a crime that everybody would agree is one involving moral turpitude. And, in fact, he's convicted under a section of the statute where the overwhelming majority of the crimes ---- We're talking about sexual abuse of a minor. How often is it going to be that somebody who's convicted of sexual abuse of a minor is not going to be considered to have committed a crime involving moral turpitude? So the example, the hypothetical that you're throwing out under this particular subsection, no, it's not going to come up. It's like being convicted of murder. That's an aggravated felony, but it's always going to be a crime involving moral turpitude. Every single time it's going to be a crime involving moral turpitude. So it's not going to mean that ---- There's not going to be this issue of people who are convicted of more serious crimes, less serious crimes. If you're convicted of murder, absolutely it's an aggravated felony. It's also a crime involving moral turpitude. I wasn't asking more serious, less serious. You don't have to line them up on a spectrum. I just wanted to know if the result that you seek would have the consequence of the difference in eligibility of aggravated felons whose crimes are not morally turpitudinous and aggravated felons whose crimes are morally turpitudinous and the greater eligibility would be those who are both. Right. That's the way the system works today. That's exactly the way it works. All you have to do is depart the United States. All this does is put somebody who departed the United States or somebody who hasn't departed to the United States in the exact same position as somebody who has. So you're saying it works that way now if you've left. That is the way it works. And it should also work that way if you have not left. Right. You should not be treated less favorably simply because you didn't depart. That is the way the system works today. Let me ask you a question, Mr. Job, dealing with stare decisis. We're not starting with a fresh slate. We already have a precedent that's been on the books for 14 years. It's been followed by virtually every other circuit except the Second Circuit. And even after the Second Circuit case came out, other cases have come out that still follow our case. I'm kind of at a loss as to why we ought to revisit this to begin with. To me, Komarenko just makes no sense at all because what it seems to be saying, as I understand it, is you've got people who are otherwise similarly situated, and under Komarenko, the Court would hold that they're not similarly situated because the government is treating them differently. And the fact that the government is treating them differently is it's really a fortuitous thing, depending entirely upon whether somebody departed the United States or not. Go back to my hypothetical. How do you explain that all the other courts except the Second Circuit disagree with this? I think it's just momentum. Even bad ideas sometimes gather momentum. I mean the ---- It's sort of like Francis. I think Francis was ---- It's sort of momentum and ---- I mean, it's all a question of which one you think is correctly decided. And I think Francis was correctly decided. But they really flip sides of the same coin, aren't they? Komarenko and Francis are the same. Yeah. But the thing about Francis, and I say it's fortuitous, and I say that for this simple reason, I mean, Mr. Abebe and his twin brother, they were both subject to deportation as aggravated felons. It's just that Mr. Abebe's brother left the United States, and he was able to avoid being charged under that aggravated felony ground by departing briefly and then seeking to reenter. It's pure for, you know, it's pure happenstance that he was charged under the ground involving, crimes involving moral turpitude, and his brother was charged as an aggravated felony. It all comes down, once again, to did he depart or not. You've got two minutes left. Yes, I'll reserve. We'll hear from the government. Good morning. May it please the Court. Tom Dupree on behalf of the United States. I'd like to begin by addressing the concern raised by Judge Kleinfeld's question about the consequences of accepting Petitioner's proposed approach. Judge Kleinfeld was exactly right. Under the Petitioner's approach, garden-variety aggravated felons would not be allowed to leave the country. However, if the aggravated felon could say, wait a minute, my offense was so heinous that it constitutes a crime of moral turpitude. For that reason, I am entitled to stay in the United States. That is exactly what would happen, and as Judges Callahan and Tallman noted, this would open the door to additional litigation of people coming in exactly as the Petitioner in this case does, and says, well, I recognize that I can't obtain a waiver for my constitutes a crime of moral turpitude. I am eligible to remain in the United States. We submit that that result is unpalatable. It is an absurd result, and no circuit save the Second Circuit has endorsed it. The unanimity among the circuits is remarkable on this issue. All seven circuits, again, but for the Second Circuit, have endorsed this Court's approach in Komarenko, have endorsed the Board's comparable grounds approach, and have rejected the Petitioner's interpretation. Let's say this person you're talking about left the country and then sought reentry and said, here I am. Would that person be entitled to petition for 212C relief? Judge Pregerson, it depends on what the charge of inadmissibility was upon that person's attempt to reenter. The same charge. Well, it would not be the same charge, because Mr. Abebe, the charge of removal, is aggravated felony child molestation. The, in Your Honor's hypothetical, I'm assuming that the charge would be a crime involving moral turpitude, that that's the ground of inadmissibility. So, again, it couldn't possibly be the same charge, and I think that really highlights the difference here. In one context, you have a ground of removability, aggravated felony child abuse, and in the other hypothetical, you have a quite different ground of inadmissibility, namely crimes involving moral turpitude. So I think this is because the basis for inadmissibility and the basis for deportation are not coterminous. They're different grounds. That's exactly right, Judge Kuznicki. Which brings us back to Tapia, Kuna, and Francis, which demands some sort of equality between the two schemes as a matter of constitutional law. I mean, that's where the problem starts, by saying these two schemes have to be coterminous. Well, there's some irrationality in having a broader ground for deportation that's not also a ground for exclusion. Well, I think Francis, even in Francis, which began all of this, even Francis, the Second Circuit acknowledged that it's entirely permissible and reasonable for Congress to have separate specified grounds for removability and for inadmissibility. So I think even the Francis Court acknowledged that Congress is well within its rights, particularly in the immigration context where it gets exceedingly large. But it did seem to say they could be different, but that exclusion had to be broader in every sense than deportation. You could not have an instance where somebody is not excludable and yet deportable. Well, I think that's what it seemed to say, because you should not treat somebody who left the country better than somebody who stayed put. Well, the specific question in Francis, of course, involved two classes of individuals, both of whom were in deportation proceedings. And what troubled the Court was the fact that one class of individuals, namely, the class that left and returned, was eligible to seek 212C waivers, whereas the sedentary class, so to speak, that is to say those individuals who did not leave, were ineligible for the relief. So that was the admittedly narrow focus of the Francis Court. And to be sure, subsequent decisions have interpreted Francis more broadly. But I think at the end of the day, all Francis is saying is that with regard to those two classes, you need to extend the availability of 212C waivers to both of those classes. That's what Francis is holding is at the end of the day. Let me ask you a question. I think I know the answer, but I'm not certain. What I think I know, but may be wrong on, is exclusion never comes up unless you present – there are two ways to get into the United States. One is to present yourself at a border station or immigration station at an airport. And the other is to sneak in. We've got a lot of border. As I understand it, exclusion never comes up for people who sneak in. It only comes up for people who present themselves. Removal, however, comes up for both people who got in legally and also people who snuck in. Is that right? I think that, yes, that's a generally accurate characterization. I mean, there is some blurring of the lines. For example, if you had somebody who arrived, for instance, at an airport and tried to circumvent customs and so, in other words, didn't formally present himself, but nonetheless was caught before he effected an entry into the country, in that circumstance – We have cases that say you're treated as not having gotten in. Exactly. Even though you're physically in, as long as you're on the outside of the border station. That's exactly right. All I meant to say is that there is, I think, an element of legal fiction in terms of when we say we caught someone at the border as opposed to when they actually effected an entry into the country. But in broad terms, Your Honor is correct, that if you sneak in the country, say you're here for two or three years and then you're apprehended, at that point you're put into removal proceedings. Now, of course, under current law, there isn't an enormous amount of difference between removal proceedings and exclusion proceedings. For many purposes, they've essentially been merged. So the idea that if somebody presents himself to the lawful authorities before stepping across the border is going to be treated better than somebody who doesn't, that's not a threatening of protection. It seems to be exactly the opposite of what the PRC said. Well, I think that's generally right, Judge Kaczynski. Is it correct to say that if Tapio Kuna were overruled, or they weren't on the books, the Comerenco problem would drop out altogether? There wouldn't be a Comerenco issue. It would be up to the board to decide what it does or doesn't do, right? I think that's right. I think that's right. I'm just so that I understand that. If we were to stay with Comerenco and not take the appellant's position of adopting the blank approach, do we have to overrule Tapio Kuna, or do we have to clarify it, or? Well, certainly, you don't need to overrule it. Arguably, you could clarify it in saying that we think Comerenco was correctly decided because Comerenco, of course, was based on the validity of Tapio Kuna. So the Court, I suppose, could clarify Tapio Kuna if it wished, but certainly it does not need to overrule Comerenco. But overruling Tapio Kuna would remove the Comerenco problem. It would no longer be an issue. I think that's exactly right, Judge Kuznicki. That's another way of solving the problem. I think that's right, yes. I think also it's important to emphasize that at the end of the day, what we are talking about are specific statutory grounds for exclusion that were originally included in Section 212C. I agree with Mr. Job when he admits or he acknowledges that we've traveled far from the initial congressional design. However, I would say that under the comparable grounds rule, as the Board has articulated it in Blake, there at least is a tether, albeit a loose one, between the language of Section 212C and current practice. Under the Petitioner's approach, he essentially would sever that by saying that aliens could get waivers on all sorts of grounds that Congress never specified to be within the Attorney General's authority. So although we certainly acknowledge that the law has moved beyond the statutory text, one additional reason why the comparable grounds rule makes a lot of sense is that it does maintain that link to the language of the statute by saying that the only waivers that are available are these ones that are specified as waivers of inadmissibility as set forth in Section 212A. It is Mr. Job's position, as you understand it, if my understanding that Blake rejected Abebe's retroactivity argument. Is that what you're talking about here, and that, but that possibly Mr. Job is still asking us to conclude that the application of the longstanding statutory counterpart rule is impermissibly retroactive, or what's your, what, I understand what you're saying, tethering, or how do you understand Mr. Job's argument? Well, I understand that he has a number of arguments, certainly. One that we've spent some time discussing, of course, is the equal protection argument. With regard to the retroactivity argument, which at least I understand, and I think the Abebe panel construed as a distinct argument, I think what he's arguing there is that this statutory counterpart rule is some sort of new creature. In other words, that it did not exist prior to the Board's decision in Blake. And I think that that argument is plainly refuted. The Abebe panel recognized that Blake simply codified or crystallized existing Board decisions going back to the late 70s, shortly after Francis was decided. I'd also point out that the Blake Second Circuit panel, in fact, rejected Mr. Job's retroactivity argument, as have, has every circuit court to have confronted the issue. Right. And that's, I understand that, but is he asking us to go even further than Blake? Well, I suppose you could ask that to Mr. Job. What is your understanding? I'll ask him when he comes back. I think what Mr. Job is arguing, as far as retroactivity goes, is that the new standard, as he claims articulated in Blake, is impermissible for these various reasons, among others, that it's a new standard. The agency didn't adequately explain why it was adopting a new standard. And the standard that should be adhered to is the one that he contends was set forth in certain prior decisions, such as the matter of Granados. But I think that, as the Abebe panel recognized, Mr. Blake or Mr. Job's cases simply don't stand for that proposition, that the Board has repeatedly, clearly reaffirmed again and again the comparable grounds test. It has repeatedly said, this is the test that we are using. It has been endorsed by numerous circuit courts. It was endorsed, of course, by this Court and Komarenko. This is certainly not a new creature. And, again, I think the Abebe panel decisively refuted that, as did the Second Circuit panel in Blake. Well, from your perspective, how wide are the floodgates if we were to accept appellant's argument? Because I think what would happen is that you would have aliens who are in precisely the situation that Mr. Abebe is in, namely, they have been ordered removed on an aggravated felony ground that does not have a comparable ground in the admissibility statute. They would say, okay, I recognize I can't get an aggravated felony waiver. However, my crime was a crime of moral turpitude, and for that reason I should be allowed to stay in the country. And then I think in a AAA ---- But that's not guaranteed. I mean, that requires the exercise of discretion of the Attorney General to grant the waiver. Is that ---- That's correct. Is that very common? Well, let me first answer. You're correct. There would be an exercise of discretion. However, what we're talking about here, of course, is simply the Attorney General's statutory authority to grant these waivers. And, of course, it's our position that there's no authority for granting the waivers. So ---- I understand your position, but I have to say in some perspective it's a little perverse that the Department of Justice is busy arguing that the Attorney General should not have discretion, since presumably he's only going to exercise discretion where he thinks the facts warrant. Well, it's perhaps analogous to the issue that's often debated in asylum cases, namely whether the applicant has satisfied the statutory grounds for eligibility. And even if this Court or the Board were to determine that they did satisfy those statutory grounds, at that point, you create the opportunity for a discretionary judgment. So, again, I think you're absolutely right in that there would be an exercise of discretion. But, of course, the threshold question, and certainly one that's logically precedent to the exercise of discretion, is whether the alien has satisfied the statutory grounds for eligibility or whether it exists. Any time where an argument talks about opening up the floodgates and behind the floodgate is the exercise of discretion, well, I presume the Attorney General's not going to grant discretionary waiver in floodgate number of cases unless he thinks the facts warrant. So I'm not – I guess I don't understand this open up the floodgates type argument. Well, first of all, I think that was the – I was following up on Mr. Jobe's point. But the concern here is that you would have aliens who are denied 212c waivers on statutory eligibility grounds. So, in other words, we don't even get to the discretionary point. They get that determination, that they were statutorily ineligible for the waiver, and they appeal that determination to this Court, saying that the agency erred in finding the statutorily ineligible for a 212c waiver. That's the – that's the concern. But let me – But we're also just talking about lawful permanent residence in this case, right? So the subset is even smaller because we're not talking about all aliens. We're talking about lawful permanent residence, those people, I guess, as to whom the Attorney General has already exercised discretion to allow in the country. That's right. And let me say a bit about – So what are we really talking about in numbers? Do you have any idea? I do. That's what I was trying to get – within the last five years, the numbers have fluctuated. But they have gone anywhere from 350 – When you say they, what do you mean? You're talking about lawful permanent residence who have committed crimes of moral turpitude? 212c applications that have been adjudicated by IJs. Over the last five years, they have gone – ranged anywhere from 350 a year to 900 a year. It's correct – Mr. Jobe is correct that this is arguably – or not arguably, it is a diminishing pool because obviously the repeal of 212c makes it a fixed class. So it is diminishing. Generally speaking, the numbers have diminished over time. In the last year, there's been an uptick. So you're going to pick me out of, what, 36,000 cases – how many cases total? Well, I don't know what the total universe of aliens – I mean, I don't know how large this fits in. All I have are the absolute numbers. But it's not insignificant. And I think also following up on the colloquy that Mr. Jobe had with Judges Tallman and Callahan, I respectfully disagree that it would be a simple matter to determine whether something is a CIMT. I think it's rare, particularly in this area of law, for anything to be a simple matter. And I think particularly with regard to the CIMT issue, I'm confident that if this Court were to accept the Petitioner's ruling, we would see a lot of arguments saying, wait a minute, the police record was improperly entered. You need to look at the facts. You need to look at this. You need to do that. So I don't think it's quite as easy as Mr. Jobe suggests. And I think there would be – Well, let me – let me ask you about a particular kind of – it sounds as though the numbers are really not as great as we might have thought. So individual cases could really have an influence on Congress here. I recall that another country recently had an election. I cannot remember at the moment whether it was Pakistan or another, where one of the three candidates I think had been convicted of sex with boys and claimed that he was framed and is currently in the process of trying to get his conviction set aside so that he's eligible to take office. Now, I suppose that candidate has been convicted of a crime of moral turpitude, so he's excludable, but the Attorney General would have discretion to admit him. Is that right? Is Your Honor positive? Yes, I think that's right. If my recollection of the facts are correct. He would, again, assuming there are no other grounds for inadmissibility, but yes. So we might be concerned with a candidate having been framed for political purposes in some other country. And Congress might want to leave some room to admit them, but people convicted of aggravated felonies in our own country treat differently. That's right. I guess I might question the question. I'm trying to find out. Since the New Deal, our job has been in equal protection cases to try to imagine in some way in which what Congress did could have made sense. Right. Well, I think here, I think the starting point needs to be, as Francis recognized, that it's entirely permissible for Congress to have set up different statutory criteria and schemes governing exclusion proceedings and governing removal proceedings. And I think it's important that we begin with that baseline. Now, to the extent that the Petitioner says, well, there's some arbitrariness here, or if I did this instead of this, I'd be better off, and that doesn't quite make sense, I think as a threshold matter, I would say that even if there is some element of unfairness or arbitrariness in an individual case, that doesn't mean that the entire scheme is unconstitutional. It doesn't mean it's unconstitutional. I think we're having a problem with the ---- I think Judge Kulbis is trying to get to us twice. I'm just trying to reinforce my point. I hope it's working. So what's your best case? Taking the hypothetical we began with today, the Abebe twins, what's your best case that explains the rationale for treating them differently? I mean, we have Voe, which seems to me, as Judge Beyer pointed out, in the case of nonlawful permanent residents, you have that rationale. But what case do you have and what rationale do you have for treating the Abebe twins differently? Well, I think the rationale is, number one, that Congress is entitled to set up separate schemes. Right. What's the rationale behind that? It still has to go through an equal protection analysis. Well, it does, but I think for purpose of an equal protection analysis, the threshold question is what would make Mr. Abebe and his twin similarly situated? And under our view, what makes them similarly situated? Yes, they are. But I mean, his hypothetical is different. I just assume for the sake of argument that they are similarly situated. What's the rationale for treating them differently? Well, I think, again, it's based on the fact that Congress is entitled to set up separate schemes and that the only reason that there's even arguably an availability of a waiver for Mr. Abebe in this case is as a result of the Francis decision. So it's a little difficult to say this is what Congress's rational basis was when it set this up. Congress set up a scheme under which no aliens who were in deportation proceedings would have access to this. Of course, Francis said, no, you need to make that available. And so when it made it available, it necessarily made it available in the context of the universe in which you had separate deportation schemes and exclusion schemes. So it's a little difficult to answer Your Honor's question as to what why Congress set it up in this way or why it did this. There's no answer I can find. It seems to me that it may be I'm misinterpreting your position, but is your position basically that if you buy the your view of similarly situated, you win, and if we buy Mr. Jove's view, he wins, because there's no rational explanation if, in fact, they are similarly situated? Well, I wouldn't concede that, Your Honor. I mean, I certainly agree with the first part about how we have differently views of the different views of similarly situated. I think as to why we would treat individuals more favorably if they are trying to come into the country than persons who are already here, I mean, I think there are a number of reasons. I think it's Judge Banno to Judge Jones in the Fifth Circuit position. Well, that's the difference. So we have a lawful permanent resident here, and that's a different situation. I mean, she expressed the view of trying to get people out of the country, but we've already exercised our discretion to keep them here. They've passed all the tests of moral, you know, saying that they weren't guilty of any moral turpitude, or they're certainly people of moral character that spent the requisite amount of time here. So what's the rationale with lawful permanent residence? I'm not really trying to trick you. I'm just curious what your question is. Well, I think if Your Honor's question is why are we trying to why are we What's the rationale? Well, the rationale is that, again, we are simply applying these existing statutory And in this, in Your Honor's hypothetical, if someone who is coming in from outside is treated more favorably than someone who is here, I think you could peg it to a number of things. I mean, one possibility is you want to give people an incentive to leave the country if they've committed a crime, and the theory that, well, you're not going to be eligible for this sort of relief. I think another reason why there's sometimes this differing treatment is that under the removability procedures, you have a long list of articulated, aggravated felonies that encompass specific crimes. And so it's entirely rational to say, well, because these are crimes where the conviction would have occurred in the United States, we can say with precision, well, he was convicted of this offense or that this was a appropriate conviction. You have no concerns about what actually happened or what the base of the conviction was, whereas when you have someone coming in from outside, it's often difficult to exactly figure out what they were convicted of. You may not have access to records. You may have concerns about the quality of the proceedings abroad. And so you have different categories. You have broader, more generalized categories that would govern people who are trying to come into the country. So I think that applies to someone who has been convicted in the United States, that way they have the same record. Again, the hypothetical would be of B.B. Twins, where you have them committing the same crime on the same day with the same punishment, the same judicial record. One goes over the border to Mexico for a day and comes back and gets treated differently from his twin. Well, again, I apologize if I'm not able to answer Your Honor's question, but I mean, at the end of the day, I do think the rationale for the different treatment is simply you have different regimes governing exclusion proceedings and governing removal proceedings. And we don't need a stronger rational basis than that to explain the difference? Well, I don't think so, Your Honor. I mean, certainly if, I think, as the Francis Court had recognized, it's entirely reasonable for Congress to have specified certain criteria that would apply in one context and certain criteria that would apply in the other context. See, I would have thought you would say that the question of comparing two individuals is really not the test for equal protection. What you look at is classes of individuals. And the fact that two individuals happen to, who fall in different classes, happen to be very similar in certain ways has no bearing on equal protection, because it's not a person-to-person comparison. It's a class-to-class comparison. And I would think that your view is that those people who present themselves at the border, who are on the other side of our territorial boundaries, are, as a class, different from those people who are inside the country. And the fact that there may be some individuals in both classes that, in many ways, are similar has no bearing on equal protection analysis. Judge Kuczynski, I agree 100 percent. That was the argument I had given to Judge Thomas, but then he modified the hypothetical to say, assumed similarly situated. So, but I agree with Your Honor. I mean, that's exactly right. And that is our threshold argument, that these individuals are not similarly situated. Assume you have a can opener. So, I beg your pardon? Assume, this is an economist's job. Assume you have a can opener. Yes, yes, yes. But that is our main argument. Let me ask you something that you touched upon a little bit earlier in your answering Judge Clifton's questions. And this is something that we don't know very much about. At least, I don't. And that is what happens to cases after we send them back for the exercise of discretion, asylum cases, you know, cases of this sort. It had been my impression for many years that when we sent back, for example, an asylum case, there was an actual exercise of discretion. A lot of people didn't make it. Some did. But then my understanding changed from sort of talking to people involved in there. And they say that basically, if you get an eligibility for asylum, you always get asylum. Is that true? I mean, is that true in exercise of discretion here as well? How does the process actually work? Well, I guess, first of all, it's not true that if you're deemed statutory eligible, you automatically get it. That is not true. So what was the case? I don't think so. I think it's a reasonably high grant rate. I mean, I hesitate to put an actual number on it. But I mean, 50%, 60%, something like that. Again, I qualify that by saying I don't have the exact number, but it's not. Are you talking about asylum cases or waiver cases? 212C cases. It's not 100%. In 212C cases. So it goes up to 60%, doesn't it? That's right. Although, as I say this, I don't know, and this is obviously an important criteria, I don't know whether that 50% to 60% is based on the entire universe of 212C cases or whether it's the subset of 212C cases in which the alien has been deemed statutorily eligible. I think it actually may be the former, which would mean that it's obviously necessarily higher at the end of the day once you clear the statutory eligibility hurdle. But I don't think it's 100%, because there are certain factors that the IJ would consider, namely good moral character, the alien's conduct since the time of the offense. How about asylum? Do you know the answer to that question? I don't know the answer to that, although I suspect it is fairly high. Once you're deemed statutorily eligible. It approaches 100%, from what I understand. Isn't it? Well, I don't think it's 100%, because I know that there are cases where an alien has been denied asylum as a matter of discretion and then challenges that or at least seeks to challenge that. I think it approaches 100%. Right. So it's not 100%, but I grant Your Honor, I mean, it's exceedingly high once you're deemed statutorily eligible. I grant that point. And the same is true with 212 relief. Presumptively you get it, almost always you get it. I think that's a fair characterization. Once you're deemed statutorily eligible, I think you are likely to get it. Again, I don't know the exact number. Highly likely. That's probably a fair characterization, but since I don't know the exact number, I don't want to say on the record what it is. That's the best news I've heard in years. I'm happy to please you, Justice Breyer. I don't manage to do it often. I'm changing my views. Does the Francis logic that the grounds ought to be the same for exclusion and deportation confine itself so that it would not also apply to diseases? They're ground number one, health-related grounds for exclusion. And I'm wondering if both classes have to be treated the same, does that mean that the original distinction where Congress started off this whole business that the courts have made so complicated, does it mean that Francis has to work in both directions? Exclusion and deportation have to be the same. So if somebody wants to come in with polio, they can come in with polio if they couldn't be deported on account of having polio? I don't think Francis should be extended to that context. I'm not aware of courts doing that. Is there anything in the logic of Francis that prevents it being extended to that? Well, obviously, it turns on how you read Francis. Our reading of it is that Francis would not permit that, and that Francis was concerned about the case. My problem is, if a case says there can't be any distinction between exclusion and deportation, does it – is there something logical that says it has to be in both directions and not just whichever is more favorable to the perspective to the person who would like to be here? But I think – I don't think Francis says that. I think Francis – It didn't come up in Francis because it was not a health case. Right. But Francis, the Court explicitly recognized that it's acceptable to have different regimes governing the two. So I don't think that Francis sought to equate or say that Congress is necessarily required to have mirrors. We're dealing with permanent legal residents in this case. That's right. All right. We're not dealing with sick people. Well, correct. I mean, I understood Judge Klein. I think on that note, we thank you. Very good. Thank you. It's a good note to end on, correct? Throughout this case, the government has always based its claim on the fact – its argument that these – that individuals subject to the ground of deportability for aggravated felonies and those who are subject to inadmissibility as individuals who have been convicted of a crime involving moral turpitude are not similarly situated. They've never argued that if they were similarly situated, that there's a rational basis to distinguish and treat those with heart better. They've never argued it here. They didn't argue it in Francis. If you go back and look at Tapia Kuna, the reason that case got first, initially the Court, I think, published a disposition citing the government, but the Solicitor  recognizing that there's no rational basis. So now, 30 years later, you know, we're confronted with this identical situation and, you know, you're urging, Your Honor, that the government say, well, maybe there is a rational basis. That, you know, 31 years later, I think you've got to get – take that with a grain of salt. And I went back and I looked at that Vaux case, Your Honor, and I think you're right. The cases that they cite there, the two cases that they're relying on, are cases, I think, from the 212-H context. In the – in the 212-H context, you are comparing lawful permanent residents and non-lawful permanent residents. And it's a totally different matter here. Here, we're dealing with two groups of permanent residents, commit the exact same crime on the exact same date, one departs and the other doesn't, and only the one who departs is somehow eligible. It makes no sense. And I agree that it creates some, you know, some anomalies, but we can't fix everything. But the overwhelming disparity here is between those who depart and those who don't. That's the biggest problem in the scheme today. And that's what we would ask the Court to address today. If there are no further questions. If I – with my remaining 30 seconds, I do want to – Are you still asking us to conclude that the application of the long-standing statutory counterpart rule is impermissibly retroactive? That one I stand by. And I'll say I disagree with the panel because the panel is focused on case law from the board that doesn't deal with aggravated felonies. And if you look at the board's case law dealing with aggravated felonies, it's different. So that was rejected in Blake, though, correct? That was rejected in Blake. But in Blake, I don't think they had these unpublished decisions as well as the published decisions. But if you focus your inquiry on the treatment of the BIA with respect to people who are charged with deportability for aggravated felonies, they really did approach this. But on the court – the court-ometer or whatever, you're asking us to go a little further than Blake. Well, I think that Blake should not be applied to retroactively, but I disagree with the panel. And if you look at the analysis in matter of Munoz, the BIA was doing exactly what we're telling you you should be inquiring as a matter of request. They weren't looking at, you know, the cut, whether the language was the same. They were looking at whether the person would have been in a criminal crime. Every one of the unpublished cases that we've found, I haven't found the same case where they see – where they applied the government's version of the capital grounds that says somebody is deportable as an aggravated felon. Thank you. Thank you, Your Honor. The case is salubrious and submitted. We are adjourned.
judges: Kozinski , Pregerson, Kleinfeld , Thomas , Silverman , Gould , Tallman , Clifton , Callahan , Bea , N. Smith